Denton J. REES and Kathyrn G. Rees, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 404-59.

United States District Court D. Oregon.

Oct. 17, 1960.

A. W. Pedersen, Portland, Or., for plaintiffs.

C. E. Luckey, U. S. Atty., Edward J. Georgeff, Asst. U. S. Atty., Portland, Or., for defendant.

KILKENNY, District Judge.

Action for refund of income taxes alleged to have been overpaid for the years 1955, 1956 and 1957. Although many issues were raised under the pre-trial order, the sole question remaining for the Court's determination is whether the amount paid to plaintiffs under the provisions of a sales agreement is entitled to be taxed as capital gain.

Denton J. Rees graduated from dental school in 1935 and immediately commenced the practice of dentistry in the state of Oregon. With the exception of the period he was with the Armed Services of the United States from 1941 to 1946, Rees has continuously practiced his profession in Oregon. In 1953, Rees' health was poor and his practice had reached the stage where it was difficult for him to carry on without working extra hours and further damaging his health. This, together with the fact that he was finding it practically impossible to take vacations and refresher courses in orthodontia, in which he was specializing, caused him to consider the advantages of a partnership arrangement with a Dr. Woods and a Dr. Butori, two other orthodontists. Dr. Woods graduated from dental school in 1945 and after his service in the Navy entered into the general practice of dentistry in Portland and continued in practice until the summer of 1947 when he commenced taking a special course in orthodontia at the University of Illinois. He received his Masters degree from that institution and in January 1949, commenced the practice of orthodontia in Portland. For a considerable period of time, he was a part time instructor of orthodontia at the University of Oregon Dental School. He continued this practice until he was called into the Armed Services during the Korean War in March 1953. Dr. Butori graduated from dental school in February 1946, and after serving in the Armed Forces he practiced in Portland from 1948 until October 1951. At that time he took special training in orthodontia at the University of Washington. He received a Masters degree from such institution in 1953 and became associated with Dr. Woods in the practice of orthodontia immediately thereafter. This association continued until the formation of the partnership with Rees. Woods and Butori were practicing under a profit-sharing agreement. They were successful in their practice and were not willing to enter into a partnership arrangement other than on an equal basis. Woods and Butori were well-acquainted with Rees and with the extent of his practice and the fact that he was one of two doctors in Portland who was a member of the American Board of Orthodontics, a very prestigeous group.

During the discussions leading up to the formation of the partnership and the drafting of the agreement, the doctors very thoroughly discussed the fact that it was no more than fair that Rees should be paid a substantial sum for good will. After giving full consideration to Rees' fine reputation, both in their profession and with members of the public, which resulted in a very large number of cases being referred to his office by other dentists and by patients who had received satisfactory treatment, and by taxpayer's own personal contacts, and the benefits which would accrue to them from operating on a clinic basis, they concluded that a fair price for them to pay Rees for good will in entering into this arrangement with him would be $35,000. At that time both Dr. Woods and Dr. Butori had established a professional reputation of their own, but they felt they would greatly expedite their advance in their profession and would substantially increase their income if they formed a partnership with Rees. Insofar as known, this is the first attempt to practice orthodontia on a clinic basis. The evidence clearly shows that the partnership as formed has been extremely successful.

The contract of sale under which Rees sold good will to Butori and Woods contains the following paragraphs:

"1. Sale of Interest in Business. The Seller shall sell to the Purchasers an interest in and to the prac-

tice of the Seller operated in the Selling Building, Portland, Oregon, including the good will of the practice, the lease to the premises, and a like percentage of all furniture, fixtures, supplies, and equipment now devoted to said practice, with such changes that occur, up to the date of closing, in the normal course of business operation, and the Seller shall enter into an agreement of co-partnership with Purchasers whereby the parties hereto shall share the profits and losses equally.

"2. Exclusions. This sale does not include any cash on hand or in banks at the date of closing. Nor does this sale include any accounts receivable due to the respective parties at the date of closing, nor amounts received after date of closing for dental work done prior to the date of closing. For the purpose of this agreement dental work done before the date of closing shall include only so much of the treatment to each patient as shall have been completed before the date of closing.

* * * * * *

"6. Purchase Price. The purchase price of all the assets referred to in paragraph 1 is $40,000.00 of which $35,000.00 is attributable to the good will of Seller's established practice. (See exhibit 'A' attached for detailed breakdown of assets other than good will). The sum of $100.00 in cash, or by certified check, shall be paid to the Seller at the time of closing. The balance of $39,900.00 shall be paid by the purchasers to the Seller in equal monthly installments over a period of 10 years, or sooner at the option of the Purchasers, until the unpaid balance of $39,900.00, without interest shall have been paid in full. * * "

Three questions are presented for determination by the Court:

I. May the skill and reputation of a professional practitioner, such as a dentist, be bought and sold as good will? The contract of sale and the other evidence in the record make it very clear that the parties intended Rees would sell and Woods and Butori would purchase good will. Under Oregon law the courts will try to give effect to the provisions of the contract exactly as the parties intended them. McKenney v. Buffelen Mfg. Co., 9 Cir., 1956, 232 F.2d 5. A construction of a contract which would make a portion thereof invalid is not favored. J. C. Millett Co. v. Distillers Distributing Corp., 9 Cir., 1956, 258 F.2d 139.

Although some courts hold to the contrary, Carol F. Hall, 1952, 19 T.C. 445, 460, the better-reasoned cases permit a professional man to sell good will and allow capital gains treatment of the sales price. Rodney B. Horton, 1949, 13 T.C. 143; Richard S. Wyler, 1950, 14 T.C. 1251; and Estate of Masquelette v. Commissioner, 5 Cir., 1956, 239 F.2d 322. An actual sale of good will may be treated as such even though it is not specifically mentioned in the contract. Estate of Masquelette v. Commissioner, supra. O'Rear v. Commissioner, 6 Cir., 1935, 80 F.2d 473, 474, cited by defendant, was decided many years prior to the decisions in the above cases and the statements in the case concerning the sale of good will by a professional man are pure dicta. Defendant urges that Oregon has not decided this question. The Supreme Court of Oregon has held that good will is property. Kaller v. Spady, 144 Or. 206, 10 P.2d 1119, 24 P.2d 351; Levene v. City of Salem, 191 Or. 182, 229 P.2d 255. Oregon has recognized the sale of good will by physicians, surgeons, lawyers and dentists. Thompson Optical Institute v. Thompson, 119 Or. 252, 262–263, 237 P. 965. Good will is recognized as property which may be owned and disposed of by a partnership. ORS [1] 68.210(3) (b).

II. Defendant urges that good will can be sold and transferred to others only by assignment and use of the firm name

I. Oregon Revised Statutes.

to which the good will is alleged to attach.

Masquelette v. Commissioner, supra, is squarely against defendant on this point. In that case the taxpayer had been a successful public accountant for a great many years. He sold his practice, which the court held included good will, even though the contract provided that the purchasers could not use the name Masquelette in connection with their accounting practice. On September 22, 1960, the Commissioner concluded to follow such decision to the extent it stands for the proposition that the existence of a transferrable good will may be recognized in connection with the sale of a business or profession, the success of which is not dependent solely on the personal qualifications of the owner, even though such sale does not involve the assignment of the right to the exclusive use of the firm name. Rev.Rul. 60–301, I.R. B., 1960–38, 7. Masquelette and the new ruling of the Commissioner are conclusive against the defendant. I hold that, professional good will may be bought and sold.

III. The last point raised by the defendant is that the amount denominated as good will in the agreement of sale represented the agreed value placed upon an aggregate of personal and professional consideration and since the personal was not segregated from the professional, there is a failure of proof on the exact sum which was paid for good will. There is evidence that the parties took into consideration the following in arriving at the total to be paid for the good will:

"(1) The professional skill and reputation of Dr. Rees;

"(2) The fact Dr. Rees was grossing approximately $80,000 per year from his individual practice while Dr. Woods and Dr. Butori together were only grossing $40,000 per year;

"(3) The absence of Dr. Woods during the twelve-month period succeeding formation of the new partnership;

"(4) The number of prospective patients which Dr. Rees had interviewed for possible treatment in the future;

"(5) The suitability of the location of Dr. Rees' office for the practice of orthodontics on a clinic basis."

Defendant argues that all of these facts were considered and evaluated as component parts of the final sum of $35,-000 designated as the purchase price of the good will. Defendant then contends that the entire amount paid could not conceivably be classed as gain received from the sale of a capital asset, such as good will, and that the claim must be dismissed for failure of proof under the authority of Roybark v. United States, D.C.S.D.Cal., 104 F.Supp. 759, 761–762, affirmed 9 Cir., 1954, 218 F.2d 164, 166, and Corn Products Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29. Neither of these cases involved the sale of good will. However, they do announce the legal principle that the taxpayer must show that he has overpaid his tax and must also show the exact amount to which he is entitled.

As I read the record in this case, the sum of $35,000 was agreed upon by the parties as the value of the good will after taking into consideration all of the factors above mentioned. The Fifth Circuit in Masquelette approved the definition of good will by Justice Story as follows [239 F.2d 325]:

"Good will may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other acciden-

tal circumstances or necessities, or even from ancient partialities or prejudices."

This definition fits the intangible good will which was the subject of the sale for $35,000. Many factors must be considered, both by the purchasers and by the seller, in arriving at a valuation to be placed on good will. In speaking of the sale of good will, and its tax consequences, Judge Yankwich, in Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170, 176, said:

"In the last analysis, each case depends upon particular facts. And in arriving at a particular conclusion, the trier of facts must take into consideration all the circumstances proved in the case and draw from them such legitimate inferences as the occasion warrants."

There is no claim in this case that any part of the $35,000 should be allocated to the sale of the tangible assets, such as the office equipment. The defendant concedes that a fair value was fixed on those assets. Defendant's sole contention is that the parties should not have taken into consideration the professional skill, reputation and earning ability of Dr. Rees, or the earning ability of Dr. Woods or Dr. Butori, the fact that Dr. Woods was going to be absent for a period of 12 months, the reaction of future patients of Dr. Rees and the suitability of Rees' office for the practice of orthodontics on a clinic basis. Any practical businessman would have discussed those features and most, if not all, would affect the judgment of a practical businessman as to what he would pay for the good will of the business or profession. A business contract must be construed in the light of sound business practice. E. I. du Pont de Nemours v. Claiborne-Reno Co., 8 Cir., 1933, 64 F.2d 224, 89 A.L.R. 238; Erie Rwy. Co. v. Ohio Public Service Co., 6 Cir., 1932, 62 F.2d 83.

The intangible which was bought and sold under the contract of sale and under the testimony was good will within the above definition of that term. The fact that Rees did not sell all of the good will is of no significance. Masquelette v. Commissioner, supra, at page 326.

Counsel may prepare appropriate findings and judgment incorporating the subjects covered by this opinion and by the stipulations and agreements of the parties.